**ROCKY MOUNTAIN GREYHOUND PARK, INC., d/b/a Rocky Mountain Greyhound Park, Plaintiff–Appellant and Cross–Appellee,**

**v.**

**WEMBLEY, PLC; Wembley Holdings, Ltd.; Racing Associates of Colorado Limited, a Colorado limited partnership; and Wembley Arapahoe Holdings, Inc., d/b/a Arapahoe Park, Defendants–Appellees and Cross–Appellants,**

**and**

**Division of Racing Events, State of Colorado, Department of Revenue, Appellee.**

No. 98CA0254.

Colorado Court of Appeals, Div. II.

Dec. 9, 1999.

James K. Kreutz & Associates, P.C., James K. Kreutz, Englewood, Colorado; Holme Roberts & Owen, LLP, Richard R. Young, Susan D. Campbell, Colorado Springs, Colorado, for Plaintiff–Appellant and Cross–Appellee.

Holland & Hart LLP, Jack M. Englert, Jr., Stephen G. Masciocchi, Denver, Colorado, for Defendants–Appellees and Cross–Appellants.

Ken Salazar, Attorney General, Robert H. Dodd, Jr., Assistant Attorney General, Denver, Colorado, for Appellee.

Opinion by Judge CRISWELL.

Plaintiff, Rocky Mountain Greyhound Park, Inc., appeals from the summary judgment entered in favor of defendants, Wembley PLC, Wembley Holdings, Ltd., Racing Associates of Colorado, Ltd., and Wembley Arapahoe Holding, Inc. We affirm.

Plaintiff is licensed by the state to operate a dog racing track in Colorado Springs, to conduct pari-mutuel wagering on those races and on simulcasts of races held at other

locations, and to operate an off-track betting facility in Sheridan.

Defendants own and operate Arapahoe Park, which is licensed to hold horse racing meets and to conduct pari-mutuel wagering on the races. Arapahoe Park is the only class B horse track in Colorado. *See* § 12–60–102(4)(a)(I), C.R.S.1999 .(Class B horse track must conduct a minimum of 30 days of horse races).

In addition to holding live races at their tracks and accepting wagers on those races, both plaintiff and defendants operate simulcast facilities at their tracks and accept wagers on simulcast races. In addition, plaintiff receives simulcasts of races at its off-track betting location.

From time to time, plaintiff and defendants have entered into interfacility simulcast agreements. Under these agreements, the "host" facility, which is conducting live racing, telecasts its races to a "guest" facility, where customers of that facility place wagers on the simulcast races. The host and guest facilities share the revenues generated from wagering at the guest facility according to the terms of the agreements.

Prior to 1993, the general assembly had provided that any operator of a guest facility receiving simulcast horse races would retain five percent of the gross receipts of pari-mutuel wagers placed on the simulcast races at that facility. *See* Colo. Sess. Laws 1993, ch. 234, § 12–60–701(2)(c) at 1229.

While this statute was in effect, the parties entered into a "settlement agreement" whereby defendants, as the host, agreed to provide simulcast signals of live horse races held at Arapahoe Park to plaintiff's satellite facilities located at its race track and at its off-track betting facility. Consistent with the statute, this agreement provided that each guest facility would receive a facility fee of five percent.

Arapahoe Park, as the only Class B horse track in Colorado, is the only facility in the state that is authorized to receive simulcasts of horse races held in other states directly from out-of-state tracks. Other simulcast facilities may also receive simulcasts of out-of-state horse races, but only if they are trans-mitted from an in-state simulcast facility located at a class B track. Section 12–60–602(5)(b), C.R.S.1999.

Hence; the settlement agreement also provided for the re-telecast by Arapahoe Park of the out-of-state races to plaintiff's facilities. For these simulcasts, plaintiff was to receive a facility fee consistent with the agreements between Arapahoe Park and the out-of-state tracks.

Thereafter, the parties entered into several interfacility simulcast agreements pursuant to which defendants transmitted simulcasts of horse races from Arapahoe Park and relayed simulcasts of out-of-state horse races to both of plaintiff's facilities. Until the events giving rise to this litigation, plaintiff received five percent of the gross receipts from pari-mutuel wagers placed on simulcast races at its facilities in accordance with § 12–60–701(2)(c) and the settlement agreement.

In April 1996, however, the General Assembly modified § 12–60–701(2)(c) by adding a new provision, § 12–60–701(2)(c)(II)(A), C.R.S.1999, which is to be automatically repealed in April 2003. That provision reads as follows:

> Of the five percent of gross receipts retained ... [by the guest facility], the operator of a simulcast facility that is not located at a class B track and that receives simulcast races of horses shall remit to the operator of the class B track from which such simulcast races were received one-fifth, representing one percent of the gross receipts of pari-mutuel wagering placed on such simulcast races at the simulcast facility.

At the time the legislature was considering this new provision, the last authorized live races at Arapahoe Park for the 1995 racing season had concluded. Thereafter, defendants had publicly announced that, because of financial problems, they would be unable to reopen Arapahoe Park the following season and that they would not seek approval to run any more live races at that track. Such a course of action would have meant that there would have been no class B horse race track in the state and no means under the Colorado statutes for any simulcast facility to

receive simulcasts of any out-of-state horse races.

Following the enactment of § 12–60–701(2)(c)(II)(A), however, defendants requested authorization for a new season of races at Arapahoe Park. After receiving approval to conduct the races, defendants tendered to plaintiff two interfacility simulcast agreements which provided for a four percent fee, rather than the five percent fee that had been contemplated by the settlement agreement. Plaintiff signed the agreements, which were consistent with the new statutory provision, but specifically noted that it was not waiving any of the rights granted to it in the settlement agreement.

Later, plaintiff filed its complaint against defendants seeking, *inter alia,* a declaratory judgment that § 12–60–701(2)(c)(II)(A) violates the equal protection clauses of the United States Constitution and Article II, § 25 of the Colorado Constitution. After the parties filed cross motions for summary judgment, the court granted defendants' motion and ruled that, although § 12–60–701(2)(c)(II)(A) discriminates between "similarly situated" parties, the statute is not unconstitutional because it has a rational basis for the distinction made by it.

■ Plaintiff argues that the trial court erred in holding that § 12–60–701(2)(c)(II)(A) does not violate the constitutional provisions guaranteeing it equal protection of the laws. It asserts that that statute treats dog tracks differently from horse tracks although they are similarly situated. We disagree.

■ When a statute is challenged as violating equal protection because it treats two groups differently, the threshold question presented is whether those two groups are similarly situated. If they are not similarly situated, the equal protection guarantee is not implicated. *Christie v. Coors Transportation Co.,* 933 P.2d 1330 (Colo.1997).

Here, the trial court found that both types of race tracks are similarly situated for purposes of an equal protection analysis. Defendants challenge this conclusion and advance reasonable arguments for reaching the contrary determination. However, we will assume that the trial court's conclusion was correct. Nevertheless, we conclude that the challenged statute does not offend against equal protection.

■ In an equal protection analysis, the level of judicial scrutiny varies according to the type of classification involved and the nature of the right affected. If a classification does not infringe on a fundamental right and is not based on either a suspect classification or a classification requiring intermediate scrutiny, the rational basis standard of review is used. *Culver v. Ace Electric,* 971 P.2d 641 (Colo.1999).

■ Under this rational basis standard, the person challenging a statute must show that the classification arbitrarily singles out a group of persons for disparate treatment in comparison to other persons who are similarly situated. Moreover, in such a review a statute is presumed to be constitutional and the party challenging its validity bears the burden of convincing the court beyond a reasonable doubt that the classification does not bear a rational relationship to a legitimate legislative purpose. If any conceivable set of facts would lead to the conclusion that a classification serves a legitimate purpose, a court must assume the existence of those facts. *Christie v. Coors Transportation Co., supra; Colorado Society of Community & Institutional Psychologists, Inc. v. Lamm,* 741 P.2d 707 (Colo.1987) (statute involving economic or social matters will be struck down only if no reasonably conceivable set of facts could establish a rational relationship between the act and a legitimate end of government).

Here, the rational basis standard of review is appropriate because § 12–60–701(2)(c)(II)(A) does not infringe upon a fundamental right, does not involve a suspect class, and does not draw a distinction that would require an intermediate level of scrutiny. Further, although we will assume that plaintiff and defendants are similarly situated as operators of simulcast facilities, we conclude that there is a rational relationship between the statutory classification and a legitimate state purpose.

We first note that, while a single legislative act, §§ 12–60–101, et seq., C.R.S.1999, regu-

lates the activities of both dog tracks and horse tracks, that act creates numerous significant regulatory differences between the two groups and between the owners and breeders comprising the two racing industries. Among the more significant differences are these:

— While there is a license fee imposed upon each type of racing endeavor, which is based upon a percentage of the track's gross receipts, the fee for wagers upon dog races (whether live or simulcast) exceeds considerably the total percentage of the fee levied upon wagers on horse races. Sections 12–60–701(1) and (2), C.R.S.1999.

— In addition, the entire license fee of the dog track is paid to the state, while only 3/4% of the horse track's gross receipts are paid to the state; 1/4% is paid to Colorado State University for use in its veterinary medicine program, and 1/2% is paid into a fund for awards to the owners and breeders of Colorado-bred horses. Section 12–60–701, C.R.S.1999.

— Under this regulatory statute, a facility may retain no more than 19 1/2% of all wagers placed on dog races, while it may retain up to 18 1/2% of all win, place, and show wagers and 25% of all other wagers on horse races. Section 12–60–702(1)(b), C.R.S. 1999.

— Horse tracks must have at least one race each racing day in which only Colorado-bred horses participate, providing such horses are available. Section 12–60–701(3), C.R.S.1999. There is no comparable requirement imposed upon dog tracks.

— While any dog or horse track may simulcast the live races held at that track to any other in-state track or off-track betting facility, only a class B horse track may receive simulcasts of out-of-state horse races, and any other in-state horse track, any in-state dog track, and any off-track facility may receive simulcasts of such races only from a class B track. In contrast, *any* dog track may simulcast an out-of-state dog race to any other simulcast facility, located at any in-state horse track, dog track, or off-track facility. However, a dog track may simulcast only special event races from out of state,

and this may be done no more than 15 days each year. A class B horse track, on the other hand, may simulcast up to 250 days of simulcast horse races from an out-of-state host track. Section 12–60–602(5)(b)(I)(A), C.R.S.1999.

— The minimum amount of purses to be paid to owners of race horses by the race track is set by statute. Section 12–60–702(1)(c), C.R.S.1999. No similar provision applies to dog tracks.

— The horse breeders' and owners' fund into which the horse tracks must pay a fee is created to improve the quality of horse-racing. No similar fund has been statutorily mandated for breeders or owners of greyhounds.

— Finally, while both class B horse tracks and all dog tracks may simulcast in-state and out-of-state races to all in-state simulcast facilities (subject to specified statutory restrictions), the statute establishes the amount that may be retained by the guest facility only in the case of simulcasts by Class B horse tracks.

Given the nature of the distinctions drawn by this statute, it is evident that the General Assembly concluded that the differing nature of the two types of racing operations merited, if they did not compel, a lesser state-imposed financial burden upon the horse-racing industry. And, while there is scant evidence in this record demonstrating the justification for that conclusion, the very nature of the two operations permits us reasonably to conceive of the existence of facts supporting it. *See Colorado Society of Community & Institutional Psychologists, Inc. v. Lamm, supra.*

First, the capital investment in land and structures to stable horses and to provide a proper size race track for those horses would necessarily exceed the investment required to build dog kennels and an abbreviated track for racing greyhounds.

In addition, the costs to the owners of the animals, both to feed, condition, and maintain them, would differ significantly. Likewise, to race a horse a human jockey is required. This, too, increases the costs to the owners.

These additional costs to the owners will be reflected in higher costs to the track

itself. Not only would these additional costs to the owners require a concomitant increase in the level of purses that must be paid, but adding the human element to the racing equation requires additional expenditures to assure that the races are fair (in the form of additional drug and other testing of the jockeys and additional surveillance of the races).

The act regulating dog and horse racing, then, recognizes the increased financial expenditures incurred by the owners and breeders of horses and by horse tracks. It chose to respond to these increased costs by making additional revenues available to the horse track, in the form of lesser charges made by the state and the retention of a greater proportion of wagers by the track, and by requiring minimum purses to be paid to the owners. In addition, it created a fund to encourage the in-state breeding of race horses.

Considering the various distinctions made by the statute generally, therefore, the conclusion is clear that those distinctions were designed to attempt to preserve the financial viability of the horse-breeding and horse racing industry. And, considering the recreational value, as well as the financial contributions made both to the state coffers and to the general economy, of these industries, their preservation is a legitimate legislative goal.

As we have noted, § 12–60–701(c) initially provided that the recipient of a simulcast from a class B horse track was to retain five percent of the wagers made on that simulcast at its facility. No comparable requirement exists for the recipient of simulcasts from dog tracks. However, plaintiff makes no complaint about *this* disparity; it does not argue that the legislative establishment of a specific amount to be retained by recipients of horse race simulcasts is, itself, improper. It argues only that the later reduction in this amount, from five percent to four percent, resulted in the equal protection violation alleged. Likewise, plaintiff has not alleged that this reduction resulted in a substantive due process violation or that it improperly impaired the obligation of a pre-existing contract.

Considering plaintiff's equal protection assertions, we conclude that the reduction itself had a rational relationship to the achievement of a legitimate legislative purpose.

Even given all the financial considerations that were then present in the racing act, Arapahoe Park announced in 1995 that it would no longer seek to hold a racing meet. Had Arapahoe Park ceased its operations, it would have meant that there would have been no horse race track in Colorado that was holding live races for 30 days or more, and also that there would have been *no* facility legally authorized to simulcast any out-of-state horse races to any in-state simulcast facility.

Aside from the impact this would have had upon the recreational opportunities in this state and the amount of funds being paid to the state, such occurrence would have had a direct and important financial impact upon two specific groups—the breeders and owners of race horses in Colorado and the other horse tracks, dog tracks, and off-track betting facilities (such as those owned by plaintiff), which had been receiving Arapahoe Park's simulcasts. No longer would there have been purses paid to horse owners, and no longer would plaintiff have been able to retain five percent of the wagers made on out-of-state simulcasts, for there would have been no such simulcasts.

Because the other financial considerations provided for by the statute had been insufficient to make the only class B horse track in the state financially sound and because these two separate groups had a direct interest in Arapahoe Park's continued operation, the General Assembly chose to provide further financial incentives to Arapahoe Park and to require that these two groups share in that endeavor.

Thus, the legislature not only reduced from five percent to four percent the amount that simulcast recipients could retain, it also reduced the amount that a class B horse track that simulcasts horse races was required to contribute to the owners and breeders fund. Section 12–60–702(1)(e)(III)(A), C.R.S.1999.

Later, in an effort to ameliorate the effect of the reduction in the fee to be retained by a facility receiving a simulcast from Arapahoe Park, the General Assembly increased by two percent (2%) the amount that such a facility may retain from the wagers on all dog races. *See* Colo. Sess. Laws 1998, ch. 256, § 12–60–702(1)(b) at 1190.

This overall scheme, in our view, was a rational approach to attempt to achieve legitimate legislative objectives—the preservation of live horse racing at a class B horse track and the preservation of off-track wagering upon out-of-state horse races.

The judgment is affirmed.

Judge ROTHENBERG and Judge RULAND concur.